| | | |
|---|---|---|
| **STEPHEN D. WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:07CV120 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Stephen D. White for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income benefits under Title XVI of the Act.  This

case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil

Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff

has filed a Brief in Support of Plaintiff's Complaint.  (Document Number 21).  Defendant has filed

a Brief in Support of the Answer.  (Doc. No. 24).

## Procedural History

On June 29, 2005, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on November 5, 2004.  (Tr. 65-70).  This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated February 16, 2007.  (Tr. 22-23, 51-55, 8-

21).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on June 6, 2007.  (Tr. 5, 2-4).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on November 29, 2006.  (Tr. 230).  Plaintiff was present and was represented by counsel.  (Id.).  The ALJ began the hearing by admitting all of the exhibits into the record.  (Tr. 351).

Plaintiff's attorney stated that plaintiff had undergone a CT scan of his lumbar[1] spine and hips the day of the hearing and that he would submit the report the week following the hearing.  (Tr. 231).  The ALJ indicated that he would leave the record open.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he lived in Fredericktown with his brother-in-law, although he uses his sister's address in St. Louis as his mailing address.  (Tr. 231-32).  Plaintiff explained that his sister does not live with her husband because they are separated.  (Tr. 232).

Plaintiff testified that he was 54 years of age and had a tenth grade education.  (Id.).  Plaintiff stated that he has not obtained a GED.  (Id.).  Plaintiff testified that he was five-feet-nine-inches tall and weighed 253 pounds.  (Id.).  Plaintiff stated that his normal weight when he was

---

[1]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

working was 180 pounds. (Id.). Plaintiff testified that he gained wait due to depression he experienced when his wife left him, he sold his house, and he had an accident at work. (Tr. 233).

Plaintiff stated that he last worked in October of 2004 at Reed Lumber. (Id.). Plaintiff testified that he operated a chop saw at a lumber plant at this position. (Id.). Plaintiff stated that he was involved in an accident at this position. (Id.). Plaintiff testified that his shirt became caught in the chop saw and he injured his hip. (Tr. 234). Plaintiff stated that he has not worked since the accident. (Id.). Plaintiff testified that he worked at Reed Lumber for four months. (Id.). Plaintiff stated that he stood and lifted 100 to 170 pounds at this position. (Id.).

Plaintiff's attorney noted that plaintiff filed a workers' compensation claim as a result of this accident and received $3,400.00 after attorney's fees. (Id.).

Plaintiff testified that prior to working for Reed Lumber he worked for Little Tykes manufacturing playground equipment. (Tr. 235). Plaintiff stated that he stood and lifted 50 to 100 pounds at this position. (Id.).

Plaintiff testified that he worked for Bodkins Lumber manufacturing pallets prior to working for Reed Lumber. (Id.). Plaintiff stated that he stood and lifted between 50 and 75 pounds at this position. (Id.).

Plaintiff testified that prior to working for Bodkins Lumber, he performed auto body work for different employers for 27 years. (Id.).

Plaintiff stated that he had no source of income at the time of the hearing. (Tr. 236). Plaintiff testified that he receives Medicaid benefits. (Id.).

Plaintiff stated that his brother-in-law drove him to the hearing. (Id.). Plaintiff testified that he drives about three times a week for about a half hour at a time. (Id.). Plaintiff stated that

he drives to the store and back, although he usually tries to find someone to drive him to the store. (Id.). Plaintiff testified that he experiences hip pain when he holds his leg in place for long periods. (Tr. 237). Plaintiff stated that he worries that he will get into an accident if he drives. (Id.). Plaintiff testified that he drives to his doctor appointments if they are close to his home. (Id.). Plaintiff stated that his sister also drives him to doctor appointments. (Id.).

Plaintiff testified that he first saw Dr. Gregory Terpstra, a company doctor, when he received his work injury. (Id.). Plaintiff stated that Dr. Terpstra administered a cortisone injection. (Id.).

Plaintiff testified that he received treatment from a nurse practitioner, Christopher Hardigan, at Great Mines Health Center. (Tr. 238). Plaintiff stated that Mr. Hardigan obtained x-rays and prescribed medication for his back. (Id.). Plaintiff testified that Mr. Hardigan told him that he would be able to provide better care if he obtained Medicaid. (Id.). Plaintiff stated that Mr. Hardigan prescribed medication for his nerves. (Id.). Plaintiff testified that Mr. Hardigan recommended that he see a psychiatrist but he was unable to due to lack of finances. (Id.).

Plaintiff stated that Dr. Sunil Chand is currently his primary physician. (Tr. 239). Plaintiff testified that Dr. Chand indicated that she knew a psychiatrist who accepts Medicaid. (Id.). Plaintiff stated that Dr. Chand does not like to prescribe narcotics. (Id.). Plaintiff testified that Dr. Chand has prescribed Zoloft[2] and plans to prescribe a medication for his nerves. (Id.).

Plaintiff's attorney stated that a Great Mines treatment note indicates that plaintiff was "kicked [] out." (Tr. 240). Plaintiff explained that he sought treatment at Great Mines for a

---

[2]Zoloft is indicated for the treatment of major depressive disorder and panic disorder. See Physician's Desk Reference (PDR), 2676-77 (57th Ed. 2003).

swollen leg and the doctor told him that he would no longer see him because plaintiff was being treated by another doctor.  (Id.).  Plaintiff stated that the doctor prescribed something for his leg.  (Id.).  Plaintiff testified that he was only seeing Dr. Chand at the time of the hearing.  (Id.).

Plaintiff stated that he underwent a CAT scan of his low back and hips at Parkland Hospital in Farmington the morning of the hearing.  (Id.).  Plaintiff testified that he has not received the results of the CAT scan.  (Tr. 241).  Plaintiff stated that Dr. Chand ordered the CAT scan.  (Id.).

Plaintiff testified that Dr. Chand wants him to see a psychiatrist.  (Id.).  Plaintiff stated that Dr. Chand's office was going to set up an appointment with a psychiatrist.  (Id.).

Plaintiff testified that he can walk between half a block to a block before his right hip and leg bother him.  (Id.).  Plaintiff stated that he can stand for ten to fifteen minutes before he has to move due to hip and leg pain.  (Id.).  Plaintiff testified that he was not experiencing difficulty sitting during the hearing.  (Id.).  Plaintiff stated that he can climb a flight of stairs slowly.  (Id.).  Plaintiff testified that he is out of breath after climbing two flights of stairs.  (Tr. 243).  Plaintiff stated that he can bend and stoop, although he experiences some mild, achy pain when doing so.  (Id.).

Plaintiff testified that he is right-hand dominant.  (Id.).  Plaintiff stated that his fingers occasionally "lock up."  (Id.).

Plaintiff testified that he is able to lift and carry about ten pounds.  (Id.).  Plaintiff stated that if he tried to lift more than ten pounds, he would either drop the item or he would have to sit down to rest.  (Id.).

Plaintiff testified that he does not exercise because he becomes sore when exercising.  (Tr.

244).  Plaintiff stated that he does not go out socially except on rare occasions when someone picks him up.  (Id.).  Plaintiff testified that he attends church every chance he gets.  (Id.).  Plaintiff stated that he attends church every Sunday if either his sister or brother takes him.  (Id.).  Plaintiff testified that he uses cushions when sitting during the service.  (Id.).  Plaintiff stated that he is not able to stand for long periods during the service.  (Id.).  Plaintiff testified that he sits down after about two-and-a-half songs.  (Id.).

Plaintiff stated that he used to enjoy fishing.  (Id.).  Plaintiff testified that he did not fish the summer prior to the hearing because he is unable to make the necessary jerking motions.  (Id.).

Plaintiff stated that on a typical day, he wakes up between 3:00 a.m. and 4:00 a.m.  (Tr. 245).  Plaintiff testified that he watches television when he wakes up in the morning.  (Id.).  Plaintiff stated that his brother picks him up and takes him to the thrift store that he owns to "hang out."  (Id.).  Plaintiff testified that his brother is a preacher and he reads the Bible to him.  (Id.).  Plaintiff stated that he goes to bed by 8:00 p.m.  (Id.).  Plaintiff testified that he sleeps three to five hours in an average night.  (Id.).

Plaintiff stated that he lives with his brother-in-law.  (Id.).  Plaintiff testified that his brother-in-law owns the home.  (Tr. 246).  Plaintiff stated that he tries to help with household chores such as dusting.  (Id.).  Plaintiff testified that he helps purchase groceries with the food stamps that he receives.  (Id.).  Plaintiff stated that he occasionally shops for groceries with his brother-in-law.  (Id.).  Plaintiff testified that he does his own laundry.  (Id.).  Plaintiff stated that he cooks some dishes, such as chili, lasagna, and grilled egg sandwiches.  (Id.).

Plaintiff testified that Dr. Chand wants to send him to a psychiatrist due to his depression

and anxiety. (Tr. 247). Plaintiff explained that he occasionally feels like he wants to "tear people's heads off," and at other times he wants to "tear my own head off." (Id.). Plaintiff testified that he also worries about owing money and becomes depressed. (Id.). Plaintiff stated that when he has anxiety he experiences shortness of breath. (Id.). Plaintiff testified that he takes Xanax[3] when he feels anxious, which provides relief. (Id.). Plaintiff stated that talking to his grandchildren also helps with his anxiety. (Id.).

Plaintiff testified that he does not drink alcohol. (Tr. 248). Plaintiff stated that he quit drinking altogether eight years prior to the hearing. (Id.). Plaintiff testified that he has not consumed a drop of alcohol in eight years. (Id.).

Plaintiff stated that he smokes one package of cigarettes a day. (Id.). Plaintiff testified that he has tried to quit a few times and that he planned to try to quit again. (Id.).

The ALJ then noted that the medical records indicate that plaintiff's doctor stopped seeing him because he was obtaining medication from more than one source. (Id.). Plaintiff testified that he sought treatment from a different doctor because he experienced swelling in his legs when he was in Potosi, which is a long distance from Dr. Chand's office. (Tr. 249). Plaintiff stated that he did not realize that he should not see more than one doctor. (Id.).

**B.   Relevant Medical Records**

The record reveals that plaintiff presented to Gregory Terpstra, D.O. on November 5, 2004, with complaints of right lower back and right hip pain following a work injury. (Tr. 123). Plaintiff reported that he was injured while operating a chop saw when his shirt became caught in

---

[3]Xanax is indicated for the short-term relief of the symptoms of anxiety. See PDR at 2794-95.

a hydraulic wheel. (Id.). Plaintiff complained of right lower back pain that does not radiate up and down the leg, with no report of weakness or loss of sensation in the right leg. (Id.). Dr. Terpstra's assessment was paralumbar muscle strain. (Id.). He recommended that plaintiff take an over-the-counter pain medication, apply ice, and exercise. (Id.). He also prescribed Flexeril.[4] (Id.).

Plaintiff saw Dr. Terpstra for a follow-up regarding his back pain on November 17, 2004, at which time plaintiff reported that he was doing better and that he was not experiencing as much pain. (Tr. 122). Dr. Terpstra's assessment was paralumbar muscle strain, which appears to be resolving. (Id.). Dr. Terpstra advised plaintiff to continue taking the Motrin and Flexeril, and continue with the ice and exercises. (Id.).

On November 29, 2004, plaintiff complained of back pain that was more localized to the low right back area. (Id.). Plaintiff reported that he had returned to his regular work duties and began to experience more discomfort. (Id.). Dr. Terpstra's assessment was right sacroiliitis.[5] (Id.). He administered a cortisone injection in the right sacroiliac joint. (Id.). Plaintiff reported immediate pain relief. (Id.).

On December 29, 2004, plaintiff reported continued pain in the right low back area. (Tr. 121). Plaintiff indicated that he had not been to work in several weeks due to transportation problems and that he had been working on a car engine instead. (Id.). Dr. Terpstra's assessment was sacroiliitis. (Id.). He recommended physical therapy and noted that he would consider a

---

[4]Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1897.

[5]Inflammation of one of the sacroiliac joints, which connect the lower spine to the pelvis. Stedman's Medical Dictionary, 1714 (28th Ed. 2006).

psychiatric referral.  (Id.).

On February 22, 2005, plaintiff reported that his back pain was getting better, except that he experienced intermittent muscle spasms on the right side and intermittent pain in the right sacroiliac and buttocks area.  (Tr. 120).  Dr. Terpstra's assessment was paralumbar muscle strain, sacroiliitis.  (Id.).  He recommended that plaintiff continue physical therapy, acetaminophen, home exercises, and ice packs.  (Id.).

On March 23, 2005, plaintiff reported that he was still having pain primarily in the right sacroiliac joint area, although his back pain had completely resolved.  (Tr. 119).  Dr. Terpstra's assessment was sacroiliitis.  (Id.).  Dr. Terpstra noted that he had tried to refer him to a specialist but the workers' compensation Board refused the referral.  (Id.).  He encouraged plaintiff to continue to use an ice pack, continue his exercises, and use acetaminophen for pain.  (Id.).

Plaintiff saw Steven S. Smith, D.O. for an internal medicine examination at the request of the state agency on August 8, 2005.  (Tr. 124-29).  Dr. Smith noted that plaintiff ambulated with a stable gait, with only a faint intermittent limp on the right.  (Tr. 126).  Plaintiff appeared comfortable standing, sitting, and in changing positions.  (Id.).  Plaintiff's lower extremity physical examination revealed normal tone and motion in both legs, with no edema, and normal joint motion.  (Id.).  Plaintiff had no tenderness on palpation of the peri-lumbar vertebral muscles, no pain was elicited by flexing the lumbars and the hips, and straight leg raising was negative for radicular pain bilaterally.  (Tr. 127).  Plaintiff was able to fully flex forward to touch his toes without difficulty.  (Id.).  Plaintiff's gait and station were normal with no limping or unsteadiness when walking freely.  (Id.).  Plaintiff was able to tandem walk, heel walk, and tip toe walk.  (Id.).  Plaintiff's cognitive function was normal.  (Id.).  Dr. Smith's impression was minor low back

strain-resolved; normal hip function bilaterally; hypertension, mild, untreated; and tobacco dependence, probably early chronic obstructive pulmonary disease (COPD).[6] (Id.). Dr. Smith stated that plaintiff has no sign of back injury or deficit. (Id.). He expressed the opinion that plaintiff has no restrictions of activity and may resume his previous occupation or work at most jobs. (Id.). Dr. Smith also noted that plaintiff should have his systolic blood pressure evaluated and stop smoking. (Id.).

Plaintiff presented to Mineral Area Regional Medical Center emergency department on September 1, 2005, with complaints of low back pain spasms that had caused him to wake two to three times the previous night. (Tr. 138). Plaintiff was prescribed Hydrocodone[7] and Norflex.[8] (Id.). On September 7, 2005, plaintiff again presented to the emergency department with complaints of back pain. (Tr. 151). Plaintiff was prescribed Indocin[9] and was told that a chiropractor may be of help. (Id.).

Joan Singer, Ph.D. completed a Psychiatric Review Technique on September 7, 2005. (Tr. 84). Dr. Singer expressed the opinion that plaintiff had no medically determinable mental impairment. (Id.).

---

[6]General term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. Stedman's at 554.

[7]Hydrocodone is indicated for the relief of moderate to moderately severe pain. See PDR at 509.

[8]Norflex is indicated for the relief of discomfort associated with acute painful musculoskeletal conditions. See PDR at 1888.

[9]Indocin is a non-steroidal drug with anti-inflammatory and analgesic properties, indicated for the relief of moderate to severe osteoarthritis. See PDR at 2013.

Plaintiff saw Kenneth Mayfield, Ph.D. for a psychological evaluation on September 21, 2005, at the request of the state agency. (Tr. 131-32). Dr. Mayfield stated that plaintiff gave no history of psychiatric evaluation or treatment and did not allege any mental health problems. (Tr. 131). Plaintiff reported that he had been married and divorced five times, and that the last divorce was very traumatic for him. (Id.). Plaintiff reported a history of substance abuse but indicated that he quit on his own six years prior. (Tr. 132). Plaintiff was found to be tense, anxious, and experienced difficulty maintaining eye contact. (Id.). Plaintiff's mood was described as depressed and his affect was congruent with his mood. (Id.). Plaintiff reported concerns about health and financial problems. (Id.). Dr. Mayfield found that plaintiff was not delusional or suicidal. (Id.). Dr. Mayfield found that plaintiff's memory was intact, his capacity for sustained concentration and attention were borderline intact, plaintiff was of average intelligence, and his judgment was intact. (Id.). The remainder of Dr. Mayfield's report is not included in the record. According to the ALJ, Dr. Mayfield diagnosed plaintiff with a mood disorder that was not otherwise specified, assessed a GAF[10] of 58,[11] indicated that plaintiff's daily function and ability to interact with others remained intact, his ability to cope with workplace stressors was highly questionable, and he was otherwise capable of comprehending and following personal and financial affairs. (Tr. 15).

Plaintiff saw Theodore Koreckij, M.D. for an orthopedic assessment examination at the

---

[10]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[11]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

request of the state agency on November 8, 2005. (Tr. 134-35). Upon physical examination, plaintiff's gait was found to be abnormal, with a mild limp on the right leg. (Tr. 134). Plaintiff was able to undress and dress himself without assistance and had appropriate active use of his upper extremities. (Id.). Dr. Kreckij noted a mild paravertebral muscle spasm as plaintiff tried to flex the spine. (Id.). Plaintiff's thoracolumbar flexion was limited by plaintiff to about thirty degrees, plaintiff's lateral bending in both directions was limited to ten degrees, and plaintiff had zero extension. (Tr. 135). Plaintiff was able to poorly heel-heel and toe-toe walk, and was able to get up onto the examining table without assistance and sit comfortably. (Id.). Plaintiff's sitting straight leg raisings were negative to ninety degrees and plaintiff was able to lie down comfortably. (Id.). Plaintiff was able to pick up either leg off the examining table to about fifteen degrees, briefly pick up both legs off the table to ten degrees, and get up from the lying to the sitting and then to the standing position without assistance. (Id.). Dr. Koreckij diagnosed plaintiff with possible lumbar disc herniation and possible SI nerve root radiculopathy.[12] (Id.). Dr. Koreckij recommended a diagnostic MRI of the lumbar spine. (Id.). Dr. Koreckij expressed the opinion that plaintiff would not be capable of performing manual labor on a consistent basis. (Id.). He noted that plaintiff may have lifting restrictions. (Id.).

On December 19, 2005, plaintiff presented to Christopher Hartigan, FNP, at Great Mines Health Center, with complaints of low back pain. (Tr. 210). Plaintiff reported chronic low back pain since October 2003, insomnia, depression, and hypertension. (Id.). Upon examination, plaintiff had tenderness in his right paralumbar muscles. (Id.). His straight leg raises were negative and he had normal sensation. (Id.). Mr. Hartigan's assessment was low back pain, hip

---

[12]Disorder of the spinal nerve roots. Stedman's at 1622.

pain, GERD,[13] chest pain, depression, and insomnia. (Id.). Mr. Hartigan prescribed Elavil,[14] Prevacid,[15] Mobic,[16] and Zoloft, and ordered x-rays of plaintiff's lumbosacral spine and right hip. (Id.). X-rays of the hips revealed possible bilateral labral disease[17] of the hips with irregular anterior/superior labrum. (Tr. 211).

Plaintiff underwent x-rays of the lumbar spine on December 20, 2005, which revealed degenerative disc disease[18] at L4-5 and L5-S1. (Tr. 157).

Plaintiff saw Mr. Hartigan on January 18, 2006, for a follow-up. (Tr. 209). Plaintiff reported that his medication had not been helping his pain, and his anxiety and insomnia were still bad. (Id.). Plaintiff indicated that his chest pain and GERD had not necessarily improved although he had not taken medication for these impairments. (Id.). Mr. Hardigan noted that plaintiff exhibited some manic symptoms. (Id.). Plaintiff also exhibited some diffuse tremors. (Id.). Mr. Hardigan's assessment was chronic pain, GERD, and depression, consider bipolar

---

[13]Gastroesophageal reflux disease (GERD) is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 556.

[14]Elavil is an anti-depressant indicated for the treatment of depression. See PDR at 3397.

[15]Prevacid is indicated for the treatment of GERD. See PDR at 3200.

[16]Mobic is indicated for the relief of osteoarthritis. See PDR at 1050.

[17]Degeneration of the acetabular labrum, which is a ring of cartilage that surrounds the socket of the hip joint. See Stedman's at 1038.

[18]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. Medical Information Systems for Lawyers, § 6:201.

disorder.[19] (Id.).  He prescribed Flexeril and Geodon,[20] and increased plaintiff's dosage of Zoloft. (Id.).

Plaintiff presented to Mr. Hartigan for a follow-up regarding anxiety and tremors on February 2, 2006.  (Tr. 208).  Mr. Hartigan noted that plaintiff had seen Dr. Marianne Klemm that day.  (Id.).  Mr. Hartigan stated that plaintiff exhibited quite a bit of anxiety, along with agitation and flight of ideas.  (Id.).  Plaintiff also exhibited tremors.  (Id.).  Mr. Hartigan's assessment was anxiety, consider bipolar; depression; GERD; and chronic back pain.  (Id.).  Mr. Hartigan prescribed Ativan,[21] Zoloft, and Trazodone,[22] and increased plaintiff's dosage of Geodon.  (Id.).

Plaintiff saw Mr. Hartigan on February 28, 2006, at which time he reported continued anxiety and low back pain.  (Tr. 207).  Mr. Hartigan's assessment was chronic low back pain; GERD, stable; insomnia, improved; and possible bipolar disorder.  (Id.).  Mr. Hartigan increased plaintiff's dosage of Geodon, continued his Zoloft and Trazodone, and prescribed Tramadol.[23] (Id.).

Plaintiff saw Mr. Hartigan on May 2, 2006, at which time he reported that his anxiety and insomnia were somewhat worse.  (Tr. 206).  A mild tremor was noted in the right upper extremity and right lower extremity.  (Id.).  Mild diffuse low back pain was also noted.  (Id.).  Mr.

---

[19]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's at 568.

[20]Geodon is indicated for the treatment of schizophrenia.  See PDR at 2602.

[21]Ativan is indicated for the treatment of anxiety.  See PDR at 856.

[22]Trazodone is indicated for the treatment of depression and anxiety.  See PDR at 1417.

[23]Tramadol is indicated for the short-term management of acute pain.  See PDR at 2508-09.

Hartigan's assessment was focal tremor, low back pain, GERD, and depression. (Id.). He prescribed Requip,[24] and increased plaintiff's dosages of Geodon and Zoloft. (Id.). He also recommended an orthopedic consult for plaintiff's hip pain. (Id.).

Plaintiff saw Mr. Hartigan on June 7, 2006 for a follow-up regarding GERD, anxiety, chest pain, tremor, and depression. (Tr. 203). Plaintiff reported palpitations two times a week with chest pain at times. (Id.). Mr. Hartigan's assessment was anxiety/depression; chest pain; palpitations; GERD; colitis,[25] resolved; and arrhythmia[26] by history. (Id.). He prescribed Ativan, Nitroglycerin,[27] and Trazodone. (Id.). He indicated that would try to get plaintiff in to Cardiology as soon as possible and that he had given plaintiff a note for Family Services to get him expedited. (Id.). In a note dated May 17, 2005, Mr. Hartigan stated that plaintiff had a potentially life-threatening arrhythmia and should have his case expedited. (Tr. 204). Mr. Hartigan attached EKG results to this note. (Tr. 205). In a note dated June 7, 2005, Mr. Hartigan stated that plaintiff was experiencing chest pain and arrhythmia, both of which likely indicate an impending myocardial infarction,[28] and that plaintiff should have his case expedited. (Tr. 204).

Plaintiff presented to St. Alexius Hospital on July 21, 2006, with complaints of

---

[24]Requip is indicated for the treatment of the signs and symptoms of idiopathic Parkinson's disease. See PDR at 1622.

[25]Inflammation of the colon. Stedman's at 408.

[26]An irregularity of the heartbeat. See Stedman's at 137.

[27]Nitroglycerin is indicated for the prevention of angina pectoris due to coronary artery disease. See PDR at 3055.

[28]Myocardial infarction, also known as a heart attack, is an infarction of a segment of heart muscle, usually due to occlusion of a coronary artery. See Stedman's at 968.

intermittent chest pain for the past six months. (Tr. 161). Plaintiff reported that he quit working at a church three months prior due to chest discomfort. (Id.). Plaintiff underwent an EKG, which was normal. (Id.). Plaintiff's physical examination was normal. (Id.). The impression of the examining physician was atypical chest pain, likely angina[29] variant given his recurrent symptoms; tobacco use, discussed at length about cessation; and depression with anxiety disorder. (Tr. 162).

Plaintiff presented to Phillip R. Cummings, FNP, at Great Mines Health Center on August 25, 2006, with complaints of anxiety. (Tr. 202). Plaintiff reported that he was placed on Xanax when he was at St. Alexius Hospital and that the Xanax worked really well. (Id.). Plaintiff was noted to have fine tremors of both upper and lower extremities. (Id.). Mr. Cummings' assessment was coronary artery disease (CAD),[30] hyperlipidemia,[31] and anxiety disorder. (Id.). After consultation with Dr. Klemm, Mr. Cummings prescribed Xanax. (Id.).

Plaintiff presented to Grace Hill Neighborhood Health Centers on September 13, 2006, with complaints of chest pain, back pain, and anxiety. (Tr. 189-92). Testing was ordered and plaintiff was referred to a psychiatrist. (Id.). Plaintiff underwent x-rays of the lumbar spine on September 19, 2006, which revealed degenerative changes of the lumbar spine, particularly of the lower lumbar spine, with evidence of degenerative disc disease, and arteriosclerosis[32] of the aorta. (Tr. 196). Plaintiff underwent x-rays of the right hip, which revealed minimal degenerative joint

---

[29]A severe constricting pain or sensation of pressure in the chest, often radiating to a shoulder and down the arm, usually caused by coronary disease. See Stedman's at 85.

[30]Narrowing of the coronary arteries, usually due to the build-up of plaque in the arteries; can cause congestive heart failure. See Stedman's at 554.

[31]Elevated levels of lipids in the blood plasma. Stedman's at 922.

[32]Hardening of the arteries. Stedman's at 144.

disease.[33]  (Tr. 197).  Plaintiff also underwent chest x-rays, which revealed a limited suggestion of slight increased pulmonary interstitial markings[34] bilaterally.  (Tr. 198).

Plaintiff saw Mr. Cummings on September 26, 2006, at which time he complained of cough, body aches, and fever.  (Tr. 201).  Mr. Cummings' assessment was bronchitis, hypertension, and anxiety disorder/depression.  (Id.).  He prescribed Zoloft, Symbyax,[35] Lipitor,[36] Benicar,[37] Soma,[38] Xanax, and medications for the bronchitis.  (Id.).

Plaintiff presented to Sunil G. Chand on November 3, 2006, with complaints of lower extremity pain and weakness.  (Tr. 220).  Dr. Chand's impression was leg edema, dyspnea, coronary artery disease, anxiety, osteoarthritis, hypercholesterolemia,[39] and hypertension.  (Tr. 221).  Dr. Chand recommended further testing.  (Id.).

Plaintiff presented to Mr. Cummings on November 7, 2006, with complaints of swelling in his ankles and pain with ambulation.  (Tr. 200).  Plaintiff reported that he had lost all of his

---

[33]Degenerative joint disease, or osteoarthritis, is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result.  See Stedman's at 1388.

[34]Spaces in the lungs.  See Stedman's at 991.

[35]Symbyax is indicated for the treatment of depression associated with bipolar disorder. See PDR at 3368.

[36]Lipitor is indicated for the treatment of hypercholesterolemia.  See PDR at 2549.

[37]Benicar is indicated for the treatment of hypertension.  See PDR at 2977.

[38]Soma is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions.  See PDR at 3254.

[39]The presence of an abnormally large amount of cholesterol in the blood.  Stedman's at 918.

medication.  (Id.).  Mr. Cummings' impression was osteoarthritis and peripheral edema.[40]  (Id.).

He prescribed Indocin.  (Id.).  Mr. Cummings noted that plaintiff was being discharged from the

care of Great Mines Health Center because plaintiff had been receiving medications from multiple

providers and had been abusing controlled substances.  (Id.).  Plaintiff admitted that he had

obtained medication from multiple providers.  (Id.).

Plaintiff saw Dr. Chand on November 10, 2006, with complaints of symptoms that Dr.

Chand described as "vague," that had been present for a few years without any recent worsening.

(Tr. 217).  Plaintiff also complained of bilateral leg edema.  (Id.).  Dr. Chand's assessment was

hypertension, chronic obstructive pulmonary disease, and acute bronchitis.  (Tr. 218).  Dr. Chand

prescribed Lasix,[41] Seroquel,[42] and an inhaler.  (Id.).

Plaintiff presented to Raffi K. Krikorian, M.D., at Comprehensive Cardiovascular

Consultants, Inc. on November 11, 2006.  (Tr. 224).  An Exercise Cardiolite Test revealed no

definite subjective or objective signs of ischemia, fair exercise tolerance, and normal blood

pressure response to exercise.  (Id.).  Nuclear Stress Images revealed possible cardiomyopathy.[43]

(Tr. 225).

On November 29, 2006, plaintiff underwent a CT scan of his lumbosacral spine, which

---

[40]Swelling in the ankles, feet, and legs.  See Stedman's at 612.

[41]Lasix is indicated for the treatment of fluid retention in adults with congestive heart
failure.  See PDR at 705.

[42]Seroquel is an antipsychotic drug indicated for the treatment of schizophrenia.  See PDR
at 681-82.

[43]Primary disease process of heart muscle in absence of a known underlying etiology.
Stedman's at 313.

revealed advanced disc narrowing at L4-5, with a left paracentral disc herniation, producing minimal impingement upon the adjacent thecal sac.[44] (Tr. 226). All other discs from T12-L1 through L3-4 and L5-S1 were without evidence of significant disc protrusion, spinal stenosis, or neuroforaminal stenosis. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.   The claimant meets the non-disability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits.

2.   The claimant did not engage in substantial gainful activity after November 5, 2004.

3.   The claimant has degenerative disc disease at L4-5 and L5-S1 with degenerative spondylosis and impingement on the thecal sac. He also has thinning of the acetabular surface of the right hip and possible degenerative labral disease, borderline cardiomyopathy, obesity, and hypertension. This combination of impairments is severe.

4.   The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

5.   The claimant's assertions of disability are not credible until January 4, 2007, when he attained age 55.

6.   The claimant's impairments preclude occasional lifting and carrying of more than 20 pounds and standing or walking more than six hours out of an eight-hour work day.

7.   The claimant has past relevant work as a saw operator, automobile body repairer, and welder.

8.   The claimant cannot perform his past relevant work.

_____

[44]A membrane that surrounds the spinal cord, spinal fluid, and nerve roots. See Stedman's at 1712.

9.    On January 4, 2007 the claimant became of advanced age, as classified by the Regulations.

10.   The claimant has an 11th grade, limited education.

11.   Considering the claimant's age, educational background, and work experience, and his limitations as set out in finding number six, a residual functional capacity, a finding of "not disabled" is found as directed by Medical-Vocational Rule 202.11 for the period from his alleged onset date until January 4, 2007.

12.   Beginning on January 4, 2007 and considering the claimant's age, educational background, and work experience, and his limitations as set out in finding number seven, a residual functional capacity, a finding of "disabled" is directed by Medical-Vocational Rule 202.02.

13.   The claimant has been under a disability, as defined in the Social Security Act, since January 4, 2007.

14.   The claimant's disability is expected to last for at least 12 continuous months.

15.   There is evidence in the record indicating that the claimant may have received worker's compensation payments after the alleged onset date.

(Tr. 19-20).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on June 29, 2005 the claimant is entitled to a Period of Disability and Disability Insurance beginning on January 4, 2007 under Sections 216(i) and 223, respectively, of the Social Security Act.

It is the further decision of the Administrative Law Judge that, based on the application filed on June 29, 2005, the claimant was disabled under section 1614(a)(3)(A) of the Social Security Act, beginning on January 4, 2007, and that the claimant's disability has continued at least through the date of this decision.

From November 5, 2004 until January 4, 2007, the claimant retained the capacity for work that existed in significant numbers in the national economy and was not under a "disability" as defined in the Social Security Act.

The component of the Social Security Administration responsible for authorizing Supplemental Security Income payments will advise the claimant regarding the non-disability requirements for these payments, and if eligible, the amount and the months for

which payment will be made.

(Tr. 20-21).

**Discussion**

**A.     Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

- 21 -

not less than 12 months." 42 U.S.C. § 416 (i) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.
See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.
 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent."

20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work:

activities of daily living, social functioning, concentration, and persistence or pace.  <u>See</u>

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-

related activities.  <u>See id</u>.  Next, the Commissioner must determine the severity of the impairment

based on those ratings.  <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is

severe, the Commissioner must determine if it meets or equals a listed mental disorder.  <u>See</u> 20

C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  <u>See id</u>.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); <u>Pratt</u>, 956

F.2d at 834-35; <u>Jones v. Callahan</u>, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.**     <u>**Plaintiff's Claims**</u>

Plaitiff raises two claims on appeal from the decision of the Commissioner.  Plaintiff first

argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and

limitation.  Plaintiff next contends that the ALJ erred in determining plaintiff's residual functional

capacity.  The undersigned will address plaintiff's claims in turn.

1.      **Credibility Analysis**

Plaintiff argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and limitation. Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is

whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant <u>Polaski</u> factors. (Tr. 17). The ALJ then properly pointed out <u>Polaski</u> factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first stated that the medical evidence prior to January 4, 2007 does not significantly bolster plaintiff's allegations of disability. (Tr. 17). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. <u>See</u> <u>Curran-Kicksey v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ noted that plaintiff received routine or conservative treatment for his impairments prior to January 4, 2007. (Tr. 18). The ALJ stated that plaintiff did not seek aggressive treatment or surgery for either his spinal or hip impairments. (<u>Id.</u>). The ALJ found that these facts are inconsistent with plaintiff's allegations of a disabling combination of impairments prior to January 4, 2007. (<u>Id.</u>).

The ALJ next pointed out that during this time, none of plaintiff's treating physicians found or imposed any long-term significant limitations on plaintiff's functional capacity. (Tr. 17-18). The presence or absence of functional limitations is an appropriate <u>Polaski</u> factor, and "[t]he lack of physical restrictions militates against a finding of total disability." <u>Hutton v. Apfel</u>, 175 F.3d 651, 655 (8th Cir. 1999) (citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993)).

The ALJ also discussed plaintiff's daily activities. (Tr. 20). The ALJ noted that plaintiff testified that he cooked, dusted, washed his clothes, talked on the phone and visited with his

relatives, and had no difficulties with his personal care. (Tr. 18, 245-46). In addition, the ALJ pointed out that the record indicates that plaintiff was working on the engine of his car on December 29. 2004. (Tr. 18, 121). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

## 2.     Residual Functional Capacity

Plaintiff argues that the residual functional capacity formulated by the ALJ is erroneous. Specifically, plaintiff contends that the ALJ provided no medical support for his determination that plaintiff was capable of performing light work. Defendant argues that the ALJ's residual functional capacity is supported by substantial evidence in the record.

After assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> [t]he undersigned finds that the claimant's physical impairments limit him to light work. The claimant's impairments preclude occasional lifting and carrying of more than 20 pounds and standing or walking more than six hours out of an eight-hour work day. This residual functional capacity precludes the claimant's past relevant work.

(Tr. 18).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

The ALJ's residual functional capacity determination is not supported by substantial evidence. In his opinion, the ALJ first discussed the objective findings of Dr. Terpstra from 2004. (Tr. 14). The ALJ noted that plaintiff reported to Dr. Terpstra in February 2005 that his back pain had improved. (Tr. 14, 120). The ALJ also discussed Dr. Smith's August 2005 examination of plaintiff, in which Dr. Smith found that plaintiff's lower back strain had resolved, his hip function was normal, and he had no restrictions of activity. (Tr. 14, 124-27).

The ALJ, however, acknowledged that plaintiff's spinal impairments worsened with time and that plaintiff developed impairments of his hips. (Tr. 14). The ALJ cited Dr. Koreckij's November 2005 examination of plaintiff, in which Dr. Koreckij noted that plaintiff had an abnormal gait and mild paravertebral muscle spasm and recommended an MRI. (Tr. 14, 134-35). Dr. Koreckij found that plaintiff would not be capable of performing manual labor on a consistent basis and would have lifting restrictions, although Dr. Koreckij did not issue specific restrictions. (Tr. 135). The ALJ also discussed subsequent objective testing. Specifically, the ALJ noted that a December 2005 MRI of plaintiff's spine indicated degenerative disc disease at L4-5 and L5-S1

and x-rays revealed possible degenerative labral disease. (Tr. 14-15, 157, 211). The ALJ next stated that plaintiff underwent an MRI of his spine in September 2006, which revealed evidence of degenerative disc disease at L4-5 and L5-S1. (Tr. 15, 196). Finally, the ALJ noted that a November 2006 CT scan of plaintiff's spine revealed that plaintiff had advanced L4-5 degenerative spondylosis with a left paracentral disc herniation, which produced minimal impingement on the thecal sac and mild hypertrophy of the facet joints. (Tr. 15, 226).

Despite the ALJ's finding based on the objective medical evidence that plaintiff's spinal impairments worsened over time, the ALJ concluded that plaintiff was capable of performing the full range of light work. (Tr. 18). The ALJ does not discuss or otherwise point to any medical evidence that supports his conclusion as to plaintiff's residual functional capacity. The ALJ found that plaintiff suffers from degenerative disc disease at L4-5 and L5-S1, with degenerative spondylosis and impingement on the thecal sac. (Tr. 16). The ALJ further found that plaintiff suffers from possible degenerative labral disease, borderline cardiomyopathy, obesity, and hypertension. (Tr. 16). None of plaintiff's treating physicians expressed an opinion regarding plaintiff's functional restrictions resulting from his impairments.

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712. Here, there is no medical evidence in the record from any physician addressing plaintiff's ability to function in the workplace after the worsening in his spinal impairments. Thus, the ALJ's residual functional capacity fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703. Additionally, the ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace.

The undersigned has found that the residual functional capacity formulated by the ALJ was not supported by substantial evidence. After assessing plaintiff's residual functional capacity the ALJ found that plaintiff cannot perform his past relevant work. (Tr. 18). The ALJ then applied the Medical Vocational Guidelines and concluded that plaintiff was disabled only beginning on January 4, 2007, due to his attaining "advanced age," at that time. (Tr. 18).

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). Use of the guidelines is permissible only if the claimant's characteristics match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 26 (8th Cir. 1997).

In this case, plaintiff's spinal impairments produce a significant amount of pain, which is a non-exertional impairment. Further, plaintiff has been diagnosed with borderline cardiomyopathy, obesity, hypertension, and mental impairments including possible bipolar disorder and depression. As such, the ALJ erred in failing to obtain the testimony of a vocational expert.

Accordingly, the court will order that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff, based on the medical evidence in the record and to order additional medical information addressing plaintiff's ability to function in the workplace. After assessing plaintiff's residual functional capacity, the

ALJ should adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict his ability to perform jobs in the national economy.

### Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled prior to January 4, 2007 is not supported by substantial evidence. The ALJ formulated a residual functional capacity that was not supported by substantial evidence. Based on this erroneous residual functional capacity, he then applied the Medical Vocational Guidelines and determined that plaintiff could perform other work existing in significant numbers in the national economy from November 5, 2004 until January 4, 2007. For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this _ 25th _ day of September, 2008.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE